*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF ROBERT MUHAMMAD, by
YREVA MUHAMMAD, Personal Representative,

Plaintiff-Appellant/Cross-Appellee,

v

WILLIAM GRESLEY, MATTHEW KAMPS,
SEBASTIEN LEBON, BERTRAND THIBAULT,
MICHAEL CHAMPRENAULT, DANIEL
MOORE, and NICOLAS PELFRENE,

Defendants-Appellees/Cross-
Appellants.

UNPUBLISHED
March 28, 2019

No. 341745
Kent Circuit Court
LC No. 16-001357-NO

ESTATE OF ROBERT MUHAMMAD, by
YREVA MUHAMMAD, Personal Representative,

Plaintiff-Appellant,

v

WILLIAM GRESLEY, MATTHEW KAMPS,
SEBASTIEN LEBON, BERTRAND THIBAULT,
MICHAEL CHAMPRENAULT, DANIEL
MOORE, and NICOLAS PELFRENE,

Defendants-Appellees.

No. 343236
Kent Circuit Court
LC No. 16-001357-NO

Before: RIORDAN, P.J., and MARKEY and LETICA, JJ.

PER CURIAM.

In these consolidated appeals, in Docket No. 341745 plaintiff, Yreva Muhammad, as personal representative of the estate of Robert Muhammad, appeals by right a December 8, 2017

-1-

trial court order granting summary disposition in favor of defendants William Gresley, Matthew Kamps, Sebastien Lebon, Bertrand Thibault, Michael Champrenault, Daniel Moore, and Nicolas Pelfrene. Defendants cross-appeal by right a trial court order denying their motions to strike certain expert witnesses. In Docket No. 343236, plaintiff appeals by right a March 20, 2018 trial court order in which the trial court imposed sanctions against plaintiff and plaintiff's counsel in the amount of $898,926 in attorney fees and $259,986 in costs. And in Docket No. 341745, we affirm the trial court's order in its entirety; in Docket No. 343236, we reverse the trial court's award of attorney fees and costs and remand for further proceedings.

## I. BACKGROUND

In 2014, defendants and Robert worked together in the Ford Group at Hutchinson Antivibration Systems, Inc. Defendants were engineers and Robert was an assistant. Defendants testified that on September 5, 2014, the Ford Group had an outing at Muskegon Lake, which included boating on Thibault's sailboat, anchoring the sailboat, and swimming to a sandy beach. At approximately 5:00 p.m. that day, Champrenault called 911 and reported that Robert went underwater while swimming back to the sailboat. Defendants testified that despite diving underwater in an effort to save Robert, they were unable to find him. Authorities recovered Robert's body from the lake the following day. The body had injuries on it. The Muskegon County Medical Examiner, Dr. Joyce DeJong, performed an autopsy and determined that Robert died of accidental drowning. The injuries were not inconsistent with accidental drowning. Plaintiff sought a second opinion and hired Dr. Werner Spitz, a former medical examiner with 64 years' experience. Dr. Spitz also concluded that Robert died of an accidental drowning and that the injuries were consistent with having been caused by aquatic predation.

On February 12, 2016, plaintiff commenced this lawsuit alleging that defendants assaulted and battered Robert causing his injuries and death. Plaintiff also alleged willful and wanton misconduct. After more than a year, thousands of pages of discovery, over 35 depositions, and numerous motion hearings, the trial court granted summary disposition in favor of defendants pursuant to MCR 2.116(C)(10). The trial court then imposed sanctions after finding that plaintiff's complaint was frivolous.

## II. DOCKET NO. 341745

### A. SUMMARY DISPOSITION

Plaintiff argues that the trial court erred in granting summary disposition in favor of defendants. "This Court reviews the grant or denial of summary disposition de novo to determine if the moving party is entitled to judgment as a matter of law." *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). "In reviewing a motion brought under MCR 2.116(C)(10), we review the evidence submitted by the parties in a light most favorable to the nonmoving party to determine whether there is a genuine issue regarding any material fact." *Cuddington v United Health Servs, Inc*, 298 Mich App 264, 270; 826 NW2d 519 (2012). "A question of fact exists when reasonable minds could differ as to the conclusions to be drawn from the evidence." *Dextrom v Wexford Co*, 287 Mich App 406, 416; 789 NW2d 211 (2010).

"In presenting a motion for summary disposition, the moving party has the initial burden of supporting its position by affidavits, depositions, admissions, or other documentary evidence." *Quinto v Cross & Peters Co*, 451 Mich 358, 362-363; 547 NW2d 314 (1996). The moving party may satisfy its burden as follows:

> First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law. [*Id*. at 362 (quotation marks and citation omitted).]

If the moving party satisfies its burden, "the burden then shifts to the opposing party to establish that a genuine issue of disputed fact exists." *Id*. "[T]he nonmoving party may not rely on mere allegations or denials in pleadings, but must go beyond the pleadings to set forth specific facts showing that a genuine issue of material fact exists." *Id*. "If the opposing party fails to present documentary evidence establishing the existence of a material factual dispute, the motion is properly granted." *Id*. at 363.

In addition, the nonmoving party must present evidence that amounts to more than speculation or conjecture. In *Skinner v Square D Co*, 445 Mich 153, 157; 516 NW2d 475 (1994), the plaintiff's decedent designed and built a tumbling machine for cleaning and finishing metal parts. The design included an electric motor that turned a drum in one direction to wash parts and in another direction to eject the parts. *Id*. The decedent installed a switch manufactured by the defendant to control the motor that turned the drum. *Id*. To change the direction of the drum, the operator had to disconnect two wires from the switch to the motor and reverse them. *Id*. at 157-158. On one occasion, while reversing the wires from the switch to the motor, the decedent was electrocuted. *Id*. at 158.

The plaintiff filed suit, alleging defective design in that the switch had a large "phantom zone" that caused the switch to "appear to be 'off' when it was actually 'on.' " *Id*. The plaintiff alleged that the design defect was the proximate cause of the decedent's fatal injury. *Id*. The trial court granted summary disposition in favor of the defendant on the ground that there was no genuine issue of material fact on the issue of causation, and this Court affirmed. *Id*. at 158-159.

In affirming this Court, the Michigan Supreme Court addressed the proof required in a case in which a plaintiff relies on circumstantial evidence to establish causation. *Id*. at 163. The Court explained as follows:

> While plaintiffs may show causation circumstantially, the mere happening of an unwitnessed mishap neither eliminates nor reduces a plaintiff's duty to effectively demonstrate causation:

> That there was no eyewitness to the accident does not always prevent the making of a possible issue of fact for the jury. But the burden of establishing proximate cause . . . always rests with the complaining party, and no presumption

of it is created by the mere fact of an accident. [*Id*. at 163-164 (quotation marks and citation omitted).]

The Court explained that, "[t]o be adequate, a plaintiff's circumstantial proof must facilitate reasonable inferences of causation, not mere speculation," and it proceeded to articulate the "basic legal distinction between a reasonable inference and impermissible conjecture" as follows:

As a theory of causation, *a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference.* There may be 2 or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any 1 of them, they remain conjectures only. On the other hand, if there is evidence which points to any 1 theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence.

We want to make clear what it means to provide circumstantial evidence that permits a reasonable inference of causation. . . . [A]t a minimum, a causation theory must have some basis in established fact. However, a basis in only slight evidence is not enough. *Nor is it sufficient to submit a causation theory that, while factually supported, is, at best, just as possible as another theory. Rather, the plaintiff must present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred.* [*Id*. at 164-165 (quotation marks and citations omitted; emphasis added).]

In a similar case addressing the proof necessary to survive a motion for summary disposition relative to the element of causation, the Michigan Supreme Court explained:

It is important to bear in mind that a plaintiff cannot satisfy this burden by showing only that the defendant *may* have caused his injuries. Our case law requires more than a mere possibility or a plausible explanation. Rather, a plaintiff establishes that the defendant's conduct was a cause in fact of his injuries only if he set[s] forth specific facts that would support a reasonable inference of a logical sequence of cause and effect. A valid theory of causation, therefore, must be based on facts in evidence. And while [t]he evidence need not negate all other possible causes, this Court has consistently required that the evidence exclude other reasonable hypotheses with a fair amount of certainty. [*Craig v Oakwood Hosp*, 471 Mich 67, 87-88; 684 NW2d 296 (2004) (quotation marks and citations omitted.]

The Court cautioned that "[i]t is axiomatic in logic and in science that correlation is not causation." *Id*. at 93. Therefore, "it is error to infer that A causes B from the mere fact that A and B occur together." *Id*.

-4-

Although *Skinner* and *Craig* addressed causation in, respectively, a products liability and negligence setting, the cases govern the analysis for determining whether a plaintiff can survive summary disposition when the plaintiff relies on circumstantial evidence to prove causation. In this case, to survive defendants' motions for summary disposition, plaintiff was required to create a genuine issue of material fact by connecting Robert's injuries to defendants' intentional conduct. Plaintiff's claims necessarily turned on proof that defendants inflicted the injuries upon Robert. Because plaintiff relied on circumstantial evidence to show that defendants caused Robert's injuries, *Skinner* and *Craig* are instructive for purposes of this case.

In this case, in moving for summary disposition, defendants satisfied their initial burden and supported their position with documentary evidence that negated plaintiff's claims of assault, battery, and willful and wanton misconduct. See *Quinto*, 451 Mich at 362-363. Specifically, defendants' evidence included the testimony of Officer Todd Dunham of the Muskegon County Sheriff's Department who asserted that there was no evidence of foul play in the case. He explained that all of the facts and circumstances surrounding the event were consistent with accidental drowning and that the evidence showed that Robert was a victim of "silent drowning." Officer Dunham testified that the photographs of Robert's body were consistent with the appearance of a drowning victim. Similarly, defendants testified that there was no animosity toward Robert. This testimony was supported by photographs of the group outing. The photograph of Robert swimming back to the boat and the timing of the 911 call supported defendants' testimonies regarding the sequence of events. Moreover, Dr. DeJong performed an autopsy and concluded that Robert died of an accidental drowning. She stated that the injuries on Robert's body were consistent with injuries sustained when a person drowns in a lake. She testified that there was no evidence of restraint and that there was no evidence that someone kicked, punched, or hit Robert. Dr. DeJong also testified that if someone had beaten Robert to death, there would have been internal injuries. And there were no internal injuries.

In addition, the only other expert to examine the body reached the same conclusion that Dr. DeJong reached. Specifically, plaintiff hired Dr. Spitz to perform a second autopsy. Dr. Spitz performed the autopsy, and his conclusions were consistent with Dr. DeJong's conclusions. Dr. Spitz, who had performed autopsies on more than 1,000 drowning victims over the course of his 64-year career, testified that Robert's death was consistent with accidental drowning. There was nothing on the body that was inconsistent with drowning. Dr. Spitz opined that the blood in Robert's left eye was consistent with a postmortem injury. The injuries, according to Dr. Spitz, were consistent with aquatic predation, and there was nothing to show that Robert was assaulted before death. Dr. Spitz explained that there was no evidence that anyone caused any trauma to Robert's body. At one point during his deposition, Dr. Spitz explained that the injuries were "100 percent complete typical manifestation of aquatic animals." Dr. Spitz claimed that there was no evidence that someone hit Robert because there was no evidence of hemorrhaging, and the injuries were typical postmortem injuries with no bleeding or "almost no bleeding." Dr. Spitz testified that the location and pattern of injuries showed aquatic predation and that none of the marks were inconsistent with aquatic predation.

Similar to the testimony of Dr. Spitz and Dr. DeJong, Dr. Badar Cassin, a forensic pathologist, testified that the abrasions on Robert's body were postmortem injuries caused by aquatic predation. He explained that the discoloration of the eye was caused by seepage of blood.

-5-

Apart from the expert testimony regarding the cause of Robert's death, defendants showed that plaintiff did not have any evidence proving that defendants assaulted and battered Robert or engaged in willful and wanton misconduct. Indeed, the testimony of plaintiff's lay witnesses revealed that they did not have any proof of assault or battery. The testimony of Ronald Muhammad and Sultan Muhammad, who investigated the incident on behalf of the Nation of Islam, of which Robert was a member, reflected that there was no evidence of assault or battery. During his deposition, Ronald Muhammad agreed that he did not have any evidence to show that any of Robert's coworkers assaulted him. Similarly, at his deposition, Sultan Muhammad testified that he did not reach any conclusions regarding the incident and that he did not know if he had evidence of an assault.

Moreover, during her deposition, when asked if, apart from her suspicions, she had "any evidence" to support the intentional tort claims at the time she filed the complaint, plaintiff responded, "I'd say no, but I think evidence could be obtained." When asked if "the thought was, we'll file the complaint and see if we can continue with the investigation?", plaintiff replied, "You could say it like that." Similarly, Robert's mother, who spoke with police during the recovery effort, testified that she was unsure if Robert was murdered because there were "a lot of possibilities" regarding the cause of Robert's death. She had no evidence that Robert was assaulted. In addition to these lay witnesses, none of the first responders testified that defendants assaulted and battered Robert.

Defendants produced substantial documentary evidence in support of their motions for summary disposition; therefore, the burden shifted to plaintiff to produce "specific facts" showing that there was a genuine issue of material fact with respect to whether defendants assaulted and battered Robert and acted with willful and wanton disregard. Plaintiff did not produce any direct evidence to support her claims. Thus, because plaintiff relied on circumstantial evidence regarding the cause of Robert's injuries, she was required to submit "substantial evidence from which a jury may conclude that more likely than not, but for defendant[s'] conduct, [Robert's] injuries would not have occurred." *Skinner* 445 Mich at 165. Instead of meeting this burden, plaintiff's evidence, viewed in a light most favorable to plaintiff, showed that any intentional acts by defendants were no more plausible than other theories as to the cause of Robert's injuries. Essentially, while there was conflicting evidence as to the timing, nature, and cause of the injuries, a review of the record indicates that there was no evidence that would allow a rational juror to conclude that an intentional tort or willful and wanton misconduct was more likely the source of Robert's injuries. As such, plaintiff attempted to create an issue of fact by relying on speculation and conjecture. See *id*.

Plaintiff presented testimony, reports, and affidavits by three expert witnesses; however, this evidence, viewed in a light most favorable to plaintiff, showed that plaintiff's tort theory was simply an explanation that was "consistent with known facts or conditions, but not deducible from them as a reasonable inference." *Id*. at 164. Instead, the evidence reflected that, at best, plaintiff's assault and battery theory was "just as possible" as defendants' accidental drowning theory. Thus, a jury would not be able to conclude that "more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred." *Id*. at 164-165.

Specifically, Dr. John Ng, M.D., an ocular trauma specialist, averred that it was "reasonable to infer that [Robert's] eye injury was the result of blunt force trauma," and that "his

-6-

heart was still beating when the blunt force made contact with his eye." Dr. Ng also averred that a subconjunctival hemorrhage did not occur underwater because he was "unaware of any evidence regarding the presence of an underwater moderate force necessary to cause such an injury." However, Dr. Ng could not link any blunt force trauma to defendants, and he agreed that he had no ability to testify that any defendant hit Robert. Dr. Ng testified that he did not know what caused Robert's eye injury. He agreed that a fist, a fall, or a strike from a stick could have caused the injury, illustrating the wide range of potential causation. Dr. Ng explained, "All I can say is this is an injury due to blunt trauma, however it happened, and whether a person did it or whether the person fell, I can't comment on that. That would be just conjecture . . . ." He agreed that he had "no evidence of exact mechanism other than my . . . estimation that this is blunt trauma."

Dr. Ng testified that, in his opinion, a drowned person would not receive the same type of injuries that Robert suffered. However, his subsequent testimony revealed that he could not rule out that Robert suffered the injury underwater. He explained, "unless something was traveling in the water—and again I said before, you know, a large fish traveling can strike you—you know, it's unlikely that—just sinking and hitting something softly is not going to cause that kind of injury." Dr. Ng also testified that he previously treated a patient who suffered similar "periocular contusions" while swimming to a boat and that he had heard of comparable injuries sustained by persons striking a fish while in the water. This testimony illustrated that there were multiple alternate theories that were just as likely to have caused Robert's injuries. Viewed in a light most favorable to plaintiff, we conclude that Dr. Ng's expert opinion did not make it more likely than not that Robert was assaulted and battered as opposed to having sustained injuries in a different manner. Rather, at best, Dr. Ng's testimony and affidavit showed that defendants "*may have caused [Robert's] injuries.*" *Craig*, 471 Mich at 87 (emphasis added). This was insufficient to create a genuine issue of material fact. See *id*.

Similarly, the testimony of Dr. John Fletemeyer, Ed.D., did not create an issue of fact regarding whether defendants assaulted and battered Robert. Dr. Fletemeyer agreed with Dr. Ng's opinion that Robert suffered blunt force trauma. He testified that Robert suffered the trauma before drowning. Dr. Fletemeyer testified that he could not dismiss the possibility of assault, but he did not have any evidence to show that Robert was put into the water following an assault. Dr. Fletemeyer opined that the trauma was not caused by natural conditions and "more likely than not" it resulted from an assault. Again, however, he agreed that he could not testify that a punch, a foot, or a stick caused the injuries and that he could not link the injuries to defendants. Dr. Fletemeyer also agreed that Robert could have hit his head on the boat and that the issue of causation was outside his realm of experience. Dr. Fletemeyer's testimony would not have allowed a rational juror to conclude that it was more likely than not that defendants' conduct caused Robert's injuries. As noted above, the evidence showed a wide range of potential sources of the injuries and even plaintiff's experts could not offer testimony to link any of the injuries to defendants.

Plaintiff also presented the expert report and testimony of Dr. Patrick Besant-Matthews, M.D., a retired forensic pathologist; however, this evidence would not have allowed a rational jury to conclude that defendants more likely than not caused Robert's injuries. Dr. Besant-Matthews opined in his report that Robert's injuries were uncommon for drowning victims and that he would have treated the case as a possible homicide. He further opined that blunt force

trauma occurred to Robert's left lower lip and left eye and that it occurred during life. Dr. Besant-Matthews also stated that Robert had different abrasions on his head as compared with other parts of his body. He averred that it was unlikely Robert struck his face on any object in the lake because of Robert's likely slow descent and that it was unlikely Robert was dragged along the bottom of the lake given the absence of scratch marks on certain parts of Robert's body. Dr. Besant-Matthews opined that scratches on Robert's cheek were consistent with fingernail marks. Dr. Besant-Matthews further indicated that Robert was likely alive when he encountered blunt force trauma and that it was "highly unlikely" that the trauma occurred underwater. Dr. Besant-Matthews also opined that the abrasions on Robert's face appeared to have had time to dry, which indicated that they occurred out of water. He also stated that there was a neck injury that was "consistent" with having been strangled from behind. Dr. Besant-Matthews opined that the injuries were not caused by aquatic predation.

Dr. Besant-Matthews's testimony did not create an issue of fact for a jury because it would not have allowed a jury to conclude that defendants' conduct was more likely than not the cause of Robert's injuries. Dr. Besant-Matthews agreed that drowning victims can sustain damages underwater. He did not know what happened to Robert's body from the time that it went missing until the time it was recovered. Dr. Besant-Matthews agreed that he had no opinion as to what caused the blunt force trauma in this case and that it was difficult to decipher when a deceased person came into contact with something as opposed to being struck by something. He was "not sure" regarding the source of Robert's injuries and had no opinion as to whether defendants had any connection to the blunt force trauma. In short, viewed in a light most favorable to plaintiff, Dr. Besant-Matthews's testimony did not connect defendants to an assault or battery. There was no evidence that defendants committed an assault or battery, and Dr. Besant-Matthews could not testify that defendants caused Robert's injuries. Therefore, Dr. Besant-Matthews's testimony, at best, showed that defendants "*may* have caused his injuries." *Craig*, 471 Mich at 87. And "[o]ur case law requires more than a mere possibility or a plausible explanation." *Id*. In this case, the testimony of Dr. Besant-Matthews was merely consistent with a possible assault and battery. It did not, however, amount to "substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred." *Skinner*, 445 Mich at 164-165.

Plaintiff contends that there are "multiple material facts in dispute." Plaintiff cites the opinions of Dr. Besant-Matthews, Dr. Ng, and Dr. Fletemeyer in support of her position that there was evidence showing that Robert's injuries occurred before he became submerged. But evidence that the injuries occurred above water did not make it more probable than not that defendants assaulted and battered Robert. See *id*. Instead, this evidence merely showed that defendants "may have caused [Robert's] injuries," and therefore, plaintiff's theory was simply an explanation "consistent with known facts or conditions, but not deducible from them as a reasonable inference." *Id*. For a jury to conclude that defendants perpetrated intentional torts against Robert based on evidence that the injuries occurred above water, the jury would have to engage in pure speculation. Moreover, "[i]t is axiomatic in logic and in science that correlation is not causation," and "it is error to infer that A causes B from the mere fact that A and B occur together." *Craig*, 471 Mich at 93.

Plaintiff also contends that there is a factual dispute regarding whether Robert's injuries occurred while he was alive. Plaintiff notes that Dr. Besant-Matthews testified that Robert's

injuries showed evidence of drying before he was submerged in water, that Robert was likely alive when he encountered blunt force trauma, and that it was "highly improbable" that Robert's swollen lip occurred after he entered the water. Plaintiff also asserts that Dr. Ng testified that the subconjunctival hemorrhage occurred while Robert was alive and that Dr. DeJong noted swelling in Robert's lip. Viewing this evidence in a light most favorable to plaintiff, even if Robert suffered injuries while he was alive, we agree this does not support the conclusion that defendants caused the injuries. Dr. DeJong testified that a drowning victim may remain alive for a few minutes before he or she becomes unconscious and dies. Therefore, the evidence showed that it was just as likely that Robert suffered the injuries while he was submerged and remained alive as it was that defendants inflicted the injuries upon Robert.

Plaintiff also contends that there was a factual dispute regarding whether the injuries were the "result of blunt force trauma/batteries." Plaintiff asserts that Dr. Besant-Matthews, Dr. Ng, and Dr. DeJong supplied evidence showing that Robert suffered blunt force trauma. However, none of the experts identified the source of any blunt force trauma, and none of the experts could link the blunt force trauma to defendants. Therefore, evidence that Robert sustained injuries from blunt force trauma would not allow a juror to conclude that more likely than not defendants assaulted and battered Robert. See *Skinner*, 445 Mich at 164-165.

Plaintiff contends that there was evidence supporting each element of the alleged intentional torts. Plaintiff cites evidence that Robert's chin injury was "more likely than not, the result of an intentional act." But as noted above, Dr. Besant-Matthews's testimony did not create an issue of fact for the jury, so this argument fails for the same reasons discussed earlier.

Finally, plaintiff argues that the trial court erred by adopting defendants' recitation of the facts, viewing forensic pathology evidence in a light most favorable to defendants, offering theories as to causation during the motion hearing, disregarding evidence consistent with plaintiff's theory of liability, and making credibility assessments. These arguments are devoid of merit. The trial court articulated and applied the proper standard for evaluating a motion for summary disposition. To the extent plaintiff takes issue with statements the trial court made during oral argument, "a court speaks through its written orders and judgments, not through its oral pronouncements." *In re Contempt of Henry*, 282 Mich App 656, 678; 765 NW2d 44 (2009). And to the extent that plaintiff contends that the trial court erred in weighing the evidence or in evaluating the expert witness testimony, a trial court's grant or denial of a motion for summary disposition is reviewed de novo. *Maiden*, 461 Mich at 118. As discussed above, there were no genuine issues of material fact based on the record submitted to the trial court. Therefore, assuming arguendo that the trial court erred as plaintiff contends, it nevertheless did not err in granting summary disposition under MCR 2.116(C)(10) in favor of defendants. See *Gleason v Mich Dep't of Transp*, 256 Mich App 1, 3; 662 NW2d 822 (2003) ("A trial court's ruling may be upheld on appeal where the right result issued, albeit for the wrong reason.").

In sum, viewed in a light most favorable to plaintiff, we conclude that plaintiff's evidence showed that an assault or battery or willful and wanton misconduct was no more plausible than other theories as to the cause of Robert's injuries. Essentially, while there was conflicting evidence with respect to the timing, nature, and source of the injuries, a review of the record indicates that the evidence would not allow a rational juror to conclude that an intentional tort or willful and wanton misconduct by defendants more likely than not caused Robert's injuries. As

such, plaintiff failed to establish the existence of a genuine issue of material fact, and the trial court did not err in granting summary disposition in favor of defendants. See *Craig*, 471 Mich at 87-88; *Skinner*, 445 Mich at 165-165.

## B. EXPERT WITNESSES

Next, plaintiff argues that the trial court abused its discretion in denying her motion to exclude certain expert witnesses, including: Officer Dunham, Gregory Dahl, a rescue diver who recovered Robert's body, and Molly Essebaggers, an investigator with the medical examiner's office. Plaintiff also maintains that the trial court abused its discretion in excluding the testimony of Dr. Robert Abbott, Ph.D., plaintiff's proposed fisheries expert.[1] These arguments lack merit.

We review for an abuse of discretion a trial court's decision to admit or exclude evidence, *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010), and review de novo a preliminary question of law regarding the admissibility of evidence under a statute or rule of evidence, *Waknin v Chamberlain*, 467 Mich 329, 332; 653 NW2d 176 (2002).

MRE 702 governs the admissibility of expert witness testimony in Michigan, and it provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

MRE 702 incorporates the standards of reliability that the United States Supreme Court established in *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993), when interpreting the equivalent federal rule of evidence. See *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 781-782; 685 NW2d 391 (2004). Under *Daubert*, a trial court must "determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 US at 592. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id*. at 592-593. Some factors that bear on the trial court's inquiry include: (1) whether the scientific knowledge or technique can, and has been, tested; (2) "whether the theory or technique has been subjected to peer review and publication";

---

[1] On cross-appeal, defendants argue that the trial court erred in denying their motions to exclude the testimony of Dr. Ng and Dr. Fletemeyer under MRE 702. However, given our conclusion that the trial court did not err in granting summary disposition in favor of defendants, we need not address these issues.

(3) "the known or potential rate of error"; (4) "the existence and maintenance of standards controlling the technique's operation"; and (5) whether there is "general acceptance" of the scientific technique. *Id*. at 593-594. However, these factors are not exclusive; instead, "[m]any factors will bear on the inquiry . . . ." *Id*. at 593. MCL 600.2955 also governs expert scientific testimony in tort actions and sets forth factors for the trial court's consideration.

A trial court is not necessarily required to hold a *Daubert* hearing to assess the qualifications of an expert under MRE 702. "[T]he *Daubert* factors may or may not be relevant in assessing reliability, depending on the nature of the issue, the expert's expertise, and the subject of the expert's testimony." *Elher v Misra*, 499 Mich 11, 24-25; 878 NW2d 790 (2016). Rather, "it is within a trial court's discretion how to determine reliability." *Id*. at 25.

## 1. OFFICER DUNHAM, ESSEBAGGERS, AND DAHL

The trial court did not err in denying plaintiff's motion with respect to Officer Dunham, Essebaggers, and Dahl. Contrary to plaintiff's argument on appeal, the trial court did not qualify these witnesses as experts. Rather, the trial court held that it would reserve ruling on the witnesses' qualifications until trial when plaintiff could raise a foundational objection. The trial court indicated that it would then determine the proper scope of testimony that each witness could offer. This did not amount to error. The trial court noted that it reviewed some of the deposition testimony of the witnesses. This was sufficient to allow the trial court to reserve ruling on whether the witnesses could offer expert testimony under MRE 702.

Moreover, even if the witnesses failed to produce expert reports, failed to review reports, and failed to specify the expert opinion that they would render, it was apparent from the deposition transcripts that each witness had extensive experience in their respective fields. Pursuant to MRE 702, an expert witness can be qualified as an expert based on his or her "knowledge, skill, *experience*, training, or education." (Emphasis added.) Therefore, the trial court did not abuse its discretion in holding that the witnesses could potentially offer expert testimony at trial limited to their area of expertise. Furthermore, Officer Dunham, Essebaggers, and Dahl did not propose to offer scientific testimony; therefore, to the extent that plaintiff cites MCL 600.2955 in support of her argument, the argument lacks merit.

Finally, the trial court did not view these witnesses as experts in granting defendants' motions for summary disposition. Accordingly, given that the trial court did not err in granting summary disposition in favor of defendants, plaintiff cannot establish error requiring reversal with respect to Officer Dunham, Essebaggers, and Dahl.

## 2. DR. ABBOTT

Plaintiff argues that the trial court erred in granting defendants' motions to exclude Dr. Abbott. Plaintiff maintains that Dr. Abbott was qualified to offer expert testimony on aquatic predation; however, plaintiff fails to provide meaningful analysis and does not cite any authority to support her position. Plaintiff has therefore abandoned this issue for review. See *Cheesman v Williams*, 311 Mich App 147, 161; 874 NW2d 385 (2015) ("An appellant may not merely announce a position then leave it to this Court to discover and rationalize the basis for the

appellant's claims."). Nevertheless, we have examined plaintiff's argument and conclude that it lacks merit.

Having reviewed Dr. Abbott's deposition testimony, we conclude that the trial court did not abuse its discretion in excluding the proposed testimony under MRE 702. Dr. Abbott's methodology and reasoning underlying his opinions were not based on sufficient facts and data, and he did not have any experience in identifying the source of an injury on a deceased body. Dr. Abbott had a Ph.D. in fisheries; his experience included working on various fisheries development, aquaculture, and environmental impact projects. He specialized in compelling fish to respond and react to sound stimuli. This did not qualify Dr. Abbott to offer an expert opinion regarding the source of an injury on a deceased body.

Moreover, the methodology Dr. Abbott utilized in this case was insufficient to show whether Dr. Abbott's conclusions could be or had been tested. Furthermore, there was insufficient information regarding whether Dr. Abbott employed a technique that had been subjected to peer review or publication; there was no information regarding any known or potential error rates; there was insufficient information regarding the standards Dr. Abbott used to arrive at his opinions. In addition, plaintiff does not cite any evidence to support that Dr. Abbott's methods were generally accepted within the scientific community. See *Daubert*, 509 US at 593-594. Accordingly, the trial court did not abuse its discretion in excluding the proposed testimony under MRE 702.

In addition, even if the trial court erred in excluding the testimony, we find nothing in Dr. Abbott's exhaustive two-volume deposition that would have allowed a jury to conclude that it was more likely than not that defendants assaulted and battered Robert. At best, Dr. Abbott would have opined that the injuries were not caused by aquatic predation. This testimony would have been duplicative to the testimony offered by Dr. Ng and Dr. Besant-Matthews, both of whom testified that Robert suffered blunt force trauma. Therefore, there is nothing about Dr. Abbott's testimony that would have changed the result of the trial court's ruling on the motions for summary disposition.

C. AMENDMENT OF COMPLAINT

Next, plaintiff argues that the trial court erred by denying her motion for leave to amend the complaint to add additional claims. "We review a denial of leave to amend a complaint for an abuse of discretion." *Casey v Auto Owners Ins Co*, 273 Mich App 388, 400-401; 729 NW2d 277 (2006). A trial court abuses its discretion when its decision falls outside the range of reasoned and principled outcomes. *Gilbert*, 470 Mich at 761-762.

MCR 2.118 governs amendment of a complaint, and it provides, in relevant part, as follows:

(1) A party may amend a pleading once as a matter of course within 14 days after being served with a responsive pleading by an adverse party, or within 14 days after serving the pleading if it does not require a responsive pleading.

-12-

(2) Except as provided in subrule (A)(1), a party may amend a pleading only by leave of the court or by written consent of the adverse party. Leave shall be freely given when justice so requires.

A trial court may deny a motion to amend for the follow reasons:

(1) undue delay, (2) bad faith or dilatory motive on the part of the movant, (3) repeated failure to cure deficiencies by amendments previously allowed, (4) undue prejudice to the opposing party by virtue of allowance of the amendment, or (5) futility of the amendment. Absent bad faith or actual prejudice to the opposing party, delay, alone, does not warrant denial of a motion to amend. [*Diem v Sallie Mae Home Loans, Inc*, 307 Mich App 204, 216; 859 NW2d 238 (2014) (quotation marks and citation omitted).]

On August 11, 2017, plaintiff moved for leave to amend the complaint to add claims of concert of action, civil conspiracy, false imprisonment, fraudulent concealment, and intentional infliction of emotional distress. The trial court denied plaintiff leave to amend the complaint, finding that the amendment was not supported by the evidence.

The trial court did not abuse its discretion in denying plaintiff leave to amend the complaint. Initially, there was undue delay in moving to amend the complaint. Plaintiff commenced this suit on February 12, 2016; discovery was extended and was set to close on August 29, 2017. Plaintiff moved to amend the complaint on August 11, 2017, more than 18 months after commencing the action and less than three weeks before discovery was scheduled to close. Plaintiff failed to explain why it took 18 months to realize that she had the additional claims. A majority of the "newly" discovered evidence unearthed during discovery concerned the conduct of the first responders that plaintiff attempted to add to the proceeding. There was no reason why plaintiff waited until shortly before discovery was set to close to move to add additional claims against defendants.

More importantly, it was evident from plaintiff's motion that the proposed amendment was futile. Plaintiff sought to add claims of civil conspiracy, concert of action, false imprisonment, and intentional infliction of emotional distress. Plaintiff failed to cite any evidence in support of these claims. The commonality of all of these additional claims is that each claim required proof of intentional conduct. For the same reasons discussed above with respect to the trial court's ruling on the motion for summary disposition, addition of these extra claims would have been futile. There was no evidence that defendants engaged in any intentional conduct that resulted in Robert's injuries or death. Plaintiff's theories amounted to nothing more than speculation and conjecture, and plaintiff failed to cite any evidence that would allow a rational jury to conclude that it was more likely than not that defendants' intentional acts caused Robert's injuries and death.

In the motion, plaintiff noted various minor inconsistencies in the voluminous record to argue that the additional claims were meritorious. However, the trial court did not abuse its discretion in finding that these inconsistencies did not amount to evidence of fraudulent concealment, concert of action, or intentional tortious conduct on the part of defendants. The evidence would not have allowed a rational juror to conclude "that more likely than not, but for

the defendant[s'] conduct, the plaintiff's injuries would not have occurred." *Skinner*, 445 Mich at 164. Accordingly, the trial court did not abuse its discretion in concluding that amendment of the complaint was futile and in denying leave to amend. See *Diem*, 307 Mich App at 216.

## III. DOCKET NO. 343236

### A. FRIVOLOUS COMPLAINT

Next, in Docket No. 343236, plaintiff contends that the trial court erred in imposing sanctions for filing a frivolous complaint.

"We review for clear error the circuit court's decision to impose sanctions on the ground that an action was frivolous within the meaning of . . . MCL 600.2591." *Ladd v Motor City Plastics Co*, 303 Mich App 83, 103; 842 NW2d 388 (2013). Similarly, "[w]e review for clear error the trial court's determination whether to impose sanctions under MCR 2.114." *Guerrero v Smith*, 280 Mich App 647, 677; 761 NW2d 723 (2008). "A decision is clearly erroneous when, although there may be evidence to support it, we are left with a definite and firm conviction that a mistake has been made." *Id.*

The trial court granted defendants' motions for sanctions pursuant to MCR 2.114[2] and MCR 2.625. MCR 2.114(C) required that "[e]very document of a party represented by an attorney shall be signed by at least one attorney of record." MCR 2.114(D) provided in relevant part that the signature of an attorney "constitutes a certification by the signer" that "to the best of his or her knowledge, information, and belief formed after reasonable inquiry, the document is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law." MCR 2.114(E) mandated sanctions for a violation of MCR 2.114.

In her brief on appeal, plaintiff contends that counsel engaged in a "reasonable inquiry" before signing the complaint. Defendants argue that, irrespective of whether plaintiff's counsel engaged in a reasonable inquiry, the complaint was not "well grounded in fact" in violation of MCR 2.114(D). The parties' focus on MCR 2.114(D) is misplaced. While the trial court cited MCR 2.114(D), our review of the language in the trial court's opinion and order reveals that the trial court awarded sanctions based on its finding that the complaint was frivolous in violation of MCR 2.114(F) and MCL 600.2591. Therefore, resolution of these issues turns on whether the trial court clearly erred in finding that the complaint was "frivolous." See *Ladd*, 303 Mich App at 83.

"Awards of costs and attorney fees are recoverable only where specifically authorized by a statute, a court rule, or a recognized exception." *Phinney v Perlmutter*, 222 Mich App 513,

---

[2] MCR 2.114 has been repealed effective September 1, 2018. Administrative Order No. 2002-31, 501 Mich cxx, cxxxvii (2018). The substantive provisions of MCR 2.114 have been incorporated into MCR 1.109. Because MCR 2.114 was in effect at the time the trial court awarded sanctions, we analyze the issue under that rule.

560; 564 NW2d 532 (1997), overruled in part on other grounds by *Garg v Macomb Co Community Mental Health Servs*, 472 Mich 263; 696 NW2d 646 (2005). MCL 600.2591 grants, and MCR 2.114(F) had granted, "a court the authority to award sanctions in the form of attorney fees and costs to a prevailing party if an action or defense is deemed 'frivolous.' " *Keinz v Keinz*, 290 Mich App 137, 141; 799 NW2d 576 (2010). MCL 600.2591(3) defines "frivolous" as follows:

(a) "Frivolous" means that at least 1 of the following conditions is met:

(*i*) The party's primary purpose in initiating the action or asserting the defense was to harass, embarrass, or injure the prevailing party.

(*ii*) The party had no reasonable basis to believe that the facts underlying that party's legal position were in fact true.

(*iii*) The party's legal position was devoid of arguable legal merit.

"The determination whether a claim or defense is frivolous must be based on the circumstances at the time it was asserted." *Robert A Hansen Family Trust v FGH Indus, LLC*, 279 Mich App 468, 486; 760 NW2d 526 (2008) (quotation marks and citation omitted). Moreover, "the mere fact that plaintiff did not ultimately prevail on its legal position does not render its filing of the complaint . . . frivolous." *Id*. at 487.

"The frivolous claims provisions impose an affirmative duty on each attorney to conduct a reasonable inquiry into the factual and legal viability of a pleading before it is signed." *Attorney General v Harkins*, 257 Mich App 564, 576; 669 NW2d 296 (2003), overruled in part on other grounds by *Garg*, 472 Mich 263 (2005). "The reasonableness of the inquiry is determined by an objective standard." *Id.* "The focus is on the efforts taken to investigate a claim before filing suit, and a determination of reasonable inquiry depends on the facts and circumstances of the case." *Id.* Moreover, "[t]he attorney's subjective good faith is irrelevant" and "[t]hat the alleged facts are later discovered to be untrue does not invalidate a prior reasonable inquiry." *Id*.

In this case, plaintiff filed the complaint on February 12, 2016. In the facts portion of her complaint, plaintiff alleged "upon information and belief" that defendants and Robert had a dispute while they were on the sailboat and that as a result of the dispute, "Defendants held, punched, kicked, and/or attacked Robert Muhammad." Plaintiff alleged that as a result of defendants' attack, Robert sustained injuries to his face and "became unconscious and subsequently died." In alleging her claim of battery, plaintiff asserted that defendants "held Robert Muhammad down and struck him about the face and head area with his [sic] fists and with an object." Plaintiff alleged that the "punches to the face caused swelling and bleeding to Robert Muhammad's lip" and that "[t]he object he [sic] struck Robert Muhammad with caused abrasions to his forehead and eyelid." Plaintiff claimed that Robert suffered "extreme mental anguish and physical pain" and that "[a]s a direct and proximate result of Defendants['] conduct, Robert Muhammad was knocked unconscious and subsequently died." Plaintiff alleged that defendants also made "intentional and unlawful threats to do bodily injury to Robert Muhammad

-15-

by force" and that defendants' actions created a "well-founded fear of imminent peril to Robert Muhammad."

The facts and evidence available at the time the complaint was filed showed that there was "[n]o reasonable basis to believe that the facts underlying [plaintiff's] legal position were in fact true," and, instead, a reasonable inquiry based on an objective standard would have revealed that plaintiff's legal position was "devoid of legal merit." MCL 600.2591(3). Accordingly, the trial court did not clearly err in finding that plaintiff's claims were frivolous.

Before the complaint was filed, a reasonable inquiry into the facts available at that time would have shown that there was not even a scintilla of evidence supporting the contention that defendants assaulted, battered, and caused Robert's death. The only two expert pathologists to have examined Robert's body concluded that he died of an accidental drowning. Dr. DeJong completed an autopsy and opined that Robert died from an accidental drowning. At the time she examined the body, Dr. DeJong was aware that Robert's family was concerned about foul play. Dr. DeJong did not find any evidence of foul play and concluded in her report that Robert's injuries were consistent with an accidental drowning.

Dr. Spitz, an experienced forensic pathologist who was retained by plaintiff to obtain a second opinion as to the cause and manner of Robert's death, arrived at the same conclusion. Like Dr. DeJong, Dr. Spitz was aware that Robert's family suspected an assault, and representatives from the Nation of Islam were present during Dr. Spitz's autopsy. Dr. Spitz opined that Robert died of an accidental drowning. Dr. Spitz discovered evidence of "foam" in the lungs, which was indicative that water was inhaled while Robert was alive. Dr. Spitz found that the body exhibited "minor, superficial injuries" that "suggest that aquatic wildlife produced the lesions in question." Dr. Spitz concluded that "an assault on Mr. Mohammad [sic] is unlikely and that his death was accidental."

In addition to the forensic pathologists, Officer Dunham concluded his investigation into the incident and completed thorough supplemental reports in which he fully discussed the evidence and acknowledged the concerns of Robert's family. And Officer Dunham determined that Robert died of an accidental drowning.

Apart from the lead investigator and the forensic pathologists, plaintiff and witnesses associated with plaintiff did not have any evidence that defendants assaulted Robert. Sultan and Ronald Muhammad, representatives of the Nation of Islam, investigated Robert's death, and neither individual had any evidence indicating that defendants assaulted and battered Robert. Similarly, plaintiff admitted during her deposition that, apart from her suspicions, she did not have evidence to support her allegations. She agreed that the idea was to file the complaint in an effort to continue the investigation.

In responding to defendants' motions for sanctions, plaintiff argued that plaintiff's counsel consulted with Dr. Besant-Matthews and that Dr. Besant-Matthews agreed to testify as an expert witness on behalf of plaintiff. Plaintiff maintained that plaintiff's counsel consulted with Dr. Besant-Matthews before filing the lawsuit. Plaintiff asserted that Dr. Besant-Matthews reviewed photographs of Robert's body and the Muskegon County Sheriff's report and "came to

the independent and reasoned opinion that Mr. Muhammad's injuries were inconsistent with an accidental drowning."

It is unclear what materials Dr. Besant-Matthews reviewed and whether he formulated an opinion before plaintiff filed the complaint. Dr. Besant-Matthews completed his original report in this case on October 22, 2016, nearly eight months after plaintiff filed the complaint. In that report, Dr. Besant-Matthews indicated that he first received materials from plaintiff's counsel on June 24, 2016, over four months after plaintiff filed the complaint. In her response to defendants' motions for sanctions, plaintiff contended that Dr. Besant-Matthews reviewed photographs and sheriff's reports and formulated an opinion *before* she filed the complaint in February 2016. However, in his October 22, 2016 report, Dr. Besant-Matthews noted that he received sheriff's reports from plaintiff's counsel on June 24, 2016, and that he received photographs from plaintiff's counsel on June 30, 2016. This information reveals that Dr. Besant-Matthews did not review the materials until over four months *after* plaintiff filed her complaint, thereby suggesting that plaintiff misrepresented plaintiff's counsel's pre-complaint investigation into the facts.

Irrespective of the timing, even assuming that Dr. Besant-Matthews prepared a report or informed plaintiff's counsel of his expert opinion before plaintiff filed the complaint, we note there was nothing in Dr. Besant-Matthews' report that provided plaintiff a reasonable basis to believe that the facts underlying her legal position were in fact true. Dr. Besant-Matthews concluded that Robert's facial injuries were "unusual for drowning cases," and had he been responsible for the case, he would have "treated the case as a possible homicide, because of blunt force injury to the left lower lip and left eye during life." According to Dr. Besant-Matthews, there were "also differences between the abrasions on the head compared to those scattered on other parts of the body surface." Dr. Besant-Matthews further opined that the "relative absence of maceration" did not support a determination that Robert was submerged for 23 hours.

Dr. Besant-Matthews' report did not provide plaintiff a reasonable basis to conclude that defendants held Robert down, attacked him, physically battered him, and caused his death. Simply because the injuries may have been "unusual" for a drowning case did not reasonably lead to a conclusion that defendants assaulted and battered Robert. Indeed, at his deposition, Dr. Besant-Matthews agreed that he had no opinion as to what caused the blunt force trauma in this case, acknowledging that it was difficult to determine if a deceased person "came into contact with something as opposed to being struck by something." He was unable to decipher the source of Robert's injuries, and he did not have any opinion as to whether defendants inflicted blunt force trauma upon Robert. Plaintiff could have learned of this aspect of Dr. Besant-Matthews' opinions and views by conducting a reasonable inquiry into his findings. Instead, there was no "reasonable basis to believe that the facts underlying [plaintiff's] legal position were in fact true," and the overwhelming evidence at the time the complaint was filed showed that plaintiff's "legal position was devoid of arguable legal merit." MCL 600.2591(3). The trial court did not clearly err in finding that plaintiff's complaint was frivolous.

## B. REASONABLENESS OF ATTORNEY FEES AND COSTS

Finally, plaintiff argues that the trial court erred in awarding attorney fees and costs as part of the sanctions award. We review the reasonableness of a trial court's award of attorney

fees and costs for an abuse of discretion. *Smith v Khouri*, 481 Mich 519, 526; 751 NW2d 472 (2008). "An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled outcomes." *Id*. In addition, "[a] court by definition abuses its discretion when it makes an error of law." *In re Waters Drainage Dist*, 296 Mich App 214, 220; 818 NW2d 478 (2012).

Under the former MCR 2.114, in the event that a trial court found that a claim was frivolous in violation of MCR 2.114(F), sanctions were mandatory under MCR 2.114(E), which provided as follows:

> If a document is signed in violation of this rule, the court, on the motion of a party or on its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including reasonable attorney fees. The court may not assess punitive damages.

Similarly, MCR 2.625 provides that "if the court finds on motion of a party that an action or defense was frivolous, costs *shall* be awarded as provided by MCL 600.2591." (Emphasis added.) MCL 600.2591 provides, in relevant part, as follows:

> (1) Upon motion of any party, if a court finds that a civil action or defense to a civil action was frivolous, the court that conducts the civil action shall award to the prevailing party the costs and fees incurred by that party in connection with the civil action by assessing the costs and fees against the nonprevailing party and their attorney.

> (2) The amount of costs and fees awarded under this section shall include all *reasonable costs actually incurred* by the prevailing party and any costs allowed by law or by court rule, including court costs and reasonable attorney fees. [Emphasis added.]

"[T]he burden of proving the reasonableness of the requested fees rests with the party requesting them." *Smith*, 481 Mich at 529. A trial court "may not award attorney fees . . . solely on the basis of what it perceives to be fair or on equitable principles." *Reed v Reed*, 265 Mich App 131, 166; 693 NW2d 825 (2005). Instead, "[w]hen requested attorney fees are contested, it is incumbent on the trial court to conduct a hearing to determine what services were actually rendered, and the reasonableness of those services." *Id*. In determining the reasonableness of a requested fee, a trial court should "consider the totality of special circumstances applicable to the case at hand." *Smith*, 481 Mich at 529. The Michigan Supreme Court has provided the following nonexclusive factors to guide a trial court in determining the reasonableness of attorney fees:

> (1) the experience, reputation, and ability of the lawyer or lawyers performing the services,

> (2) the difficulty of the case, i.e., the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly,

-18-

(3) the amount in question and the results obtained,

(4) the expenses incurred,

(5) the nature and length of the professional relationship with the client,

(6) the likelihood, if apparent to the client, that acceptance of the particular employment will preclude other employment by the lawyer,

(7) the time limitations imposed by the client or by the circumstances, and

(8) whether the fee is fixed or contingent. [*Pirgu v United Servs Auto Ass'n*, 499 Mich 269, 282; 884 NW2d 257 (2016).]


## 1. ATTORNEY FEES

In this case, in determining the reasonableness of the requested fees, the trial court, without having held an evidentiary hearing, listed the relevant factors set forth in *Pirgu* and proceeded to adopt the fee rate requested by Richard Radke, Jr., counsel for defendants Gresley, Kamps, and Lebon. After finding that Radke's fee was reasonable, the trial court applied Radke's fee rate to all of the other attorneys, multiplying that rate by the amount of hours counsel for each defendant requested. The trial court awarded all of the hours requested at Radke's rate.

The trial court abused its discretion in determining the reasonableness of attorney fees to award in this case. The Michigan Supreme Court has explained:

In considering the time and labor involved . . . the court must determine the reasonable number of hours expended by each attorney. The fee applicant *must submit detailed billing records*, which the court must examine and opposing parties may contest for reasonableness. The fee applicant bears the burden of supporting its claimed hours with evidentiary support. *If a factual dispute exists over the reasonableness of the hours billed or hourly rate claimed by the fee applicant, the party opposing the fee request is entitled to an evidentiary hearing* to challenge the applicant's evidence and to present any countervailing evidence. [*Smith*, 481 Mich at 532 (emphasis added).]

In this case, the trial court did not hold a hearing to allow plaintiff to contest the reasonableness of the hours billed or the hourly rate. Instead, after plaintiff challenged the reasonableness of the requested attorney fees, the trial court engaged in a factual analysis of whether Radke's fee rate was reasonable. The trial court did not make any findings as to the reasonableness of the hours billed; rather, it simply awarded all of the hours requested by each of the defense attorneys involved in this case. The trial court did not hold an evidentiary hearing despite plaintiff's challenge, and this amounted to error. See *id*. Therefore, we reverse and remand for an evidentiary hearing on the reasonableness of the attorney fees.

## 2. COSTS

Plaintiff also argues that the trial court erred in awarding costs because there was no support for the costs and because the trial court did not make a finding with respect to the reasonableness of the costs. We agree.

After awarding attorney fees, the trial court awarded costs as follows:

> As indicated above, defendants are entitled to awards of costs pursuant to MCR 2.625, and "expenses" pursuant to MCR 2.114. The court accepts all the "costs and expenses" figures submitted by defendants, expecting that they are objectively verifiable by receipts, travel re-imbursement claims, etc.

The trial court erred in awarding costs. The trial court did not make findings with respect to the costs and did not determine if the costs were reasonable. Instead, the trial court simply accepted the figures that defendants submitted, "expecting that they are objectively verifiable." This amounted to error. This Court cannot review the trial court's findings in regard to the reasonableness of the costs because the trial court did not make any findings relative to costs. It is clear that the trial court did not review any of the costs submitted; rather, it simply accepted the representations of defendants' attorneys without any independent review. Accordingly, reversal and remand for an evidentiary hearing is warranted.

## IV. CONCLUSION

In Docket No. 341745, we affirm the trial court's order granting summary disposition in favor of defendants. In Docket No. 343236, we reverse the trial court's order awarding attorney fees and costs and remand for further proceedings consistent with this opinion. We do not retain jurisdiction. No party having fully prevailed on appeal, we decline to award taxable costs under MCR 7.219.

/s/ Michael J. Riordan
/s/ Jane E. Markey
/s/ Anica Letica

-20-